# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

Kenneth Kelley, as the son, next of kin, and   )
heir at law of JIMMY KELLEY, deceased,   )
  )
     *Plaintiff,*   )
  )
v.   )   **No. 3:13-cv-96**
  )   **REEVES/GUYTON**
APRIA HEALTHCARE, LLC,   )
  )
     *Defendant.*   )

## <u>Memorandum Opinion and Order</u>

Before the Court is Apria Healthcare LLC's motion for the Court to reconsider its judgment. Apria previously moved for summary judgment, and it was denied. Apria now asks the Court to alter or amend the judgment according to Federal Rule of Civil Procedure 59(e). For the following reasons, the motion to reconsider is granted in part and denied in part. The Court's previous Order is vacated and replaced with this one. Apria's request to certify the Court's previous Order under 28 U.S.C. § 1292(b) is denied. Apria's motion for summary judgment is denied.

## I

Jimmy Kelley lived in a camper on property occupied by his son Kenneth. Jimmy, in his early seventies, used medical oxygen. The oxygen and equipment were provided by Apria. In February 2012, a fire broke out in the camper. Jimmy was killed.

Kenneth sued Apria and others. After four years of litigation, Apria is the only remaining defendant. Kenneth alleges that Apria was negligent in how it provided the equipment, how it maintained the equipment, how it taught Jimmy to use the equipment, and how it inspected the environment. Apria denies these allegations and claims that Jimmy contributed to the fire.

1

On September 1, 2016, Apria moved for summary judgment. The Court denied the motion on November 22, 2016. Apria now asks the Court to amend its judgment.

## II

### A

Apria asks the Court to amend its judgment under Rule 59(e). A court may grant a Rule 59(e) motion only if there is a clear error of law, newly discovered evidence, a change in controlling law, or a need to prevent manifest injustice. *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 496 (6th Cir. 2006). Apria contends that the Court's Order contains clear errors of law.

### B

If there is a clear error of law, then the Court must reevaluate that part of its Order. Apria's motion for summary judgment makes some arguments that are legal and others that are factual. The Court thus construes it as a motion for judgment on the pleadings or, alternatively, for summary judgment. *See* FED. R. CIV. P. 12(g)(2), (h)(2); *Hutchins v. First Fed. Credit Control, Inc.*, No. 2:14-cv-510, 2015 WL 11123314, at *1 (S.D. Ohio Aug. 20, 2015).

#### 1

When reviewing a motion for judgment on the pleadings, the court looks at all the pleadings filed in the case. *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016). Motions for judgment on the pleadings under Rule 12(c) are reviewed under the same standard as motions to dismiss under Rule 12(b)(6). *Id.* The complaint will survive a motion to dismiss only if, looking at the pleadings, they state a facially plausible claim for relief. *Id.*

2

To determine whether the pleadings state a facially plausible claim, the Court takes a two-step approach. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, it separates the pleadings' factual allegations from their legal conclusions. All factual allegations, and only factual allegations, are taken as true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

Second, the Court asks whether these facts amount to a plausible claim for relief. *Id.* at 555. The plaintiff does not need to make detailed factual allegations, but he must do more than simply recite the elements of the offense. *Id.* Specifically, the plaintiff must plead facts permitting a reasonable inference that the defendant is liable for the alleged conduct. *Id.* If this is not done, the claim will be dismissed. *Id.* at 570.

## 2

Summary judgment is proper only if there is no genuine issue on any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A dispute is genuine if a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*; *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 847 (6th Cir. 2016).

The moving party bears the initial burden of showing that there is no genuine issue of material fact on any element of the other party's claim or defense. *Stiles*, 819 F.3d at 847. In determining whether this burden is met, the Court views all evidence in the light most favorable to the nonmoving party and draws all inferences in his favor. *Anderson*, 477 U.S. at 255. Once the movant has satisfied this burden, the other party must identify specific facts in the record that raise a genuine issue of material fact. *Stiles*, 819 F.3d at 847. If this is not done, summary judgment is granted. FED. R. CIV. P. 56(a). The Court does not weigh evidence, judge witnesses' credibility, or decide the truth of the matter. *Anderson*, 477 U.S. at 249.

## III

## A

On summary judgment, Apria's first argument was that Kelley had released it from liability. Apria does not ask the Court to reconsider this part of its Order, so the Court will leave its reasoning as it was.

There is a genuine issue of fact about whether Kelley released Apria from liability. Under Tennessee law, when one signs a release with some tortfeasors but not others, the release does not apply to those other tortfeasors "unless its terms so provide." TENN. CODE ANN. § 29-11-105(a)(1). In March 2015, Kelley signed a release with two companies. As the release states, it applies to those two companies, their successors in interest, and "all other persons, associations, and/or corporations, whether herein named or referred to or not." [D. 260 Ex. 1 at 1]. Apria, citing the language of § 29-11-105 and the release, argues that Kelley has freed them from liability here.

Plain language, however, does not always have the final say in contract interpretation. Instead, what matters is the parties' intent. *Evans v. Tillett Bros. Contr. Co., Inc.*, 545 S.W.2d 8, 11 (Tenn. Ct. App. 1976). When the contract at issue is a release, the parties' intent is gleaned from the release's terms, "considered in the light of all the facts and circumstances." *Id.*

This requires a two-step approach. First, the Court looks at the language of the release itself. *Peatross v. Shelby Cty.*, No. W2008-2385-COA-R3-CV, 2009 WL 2922797, at *4 (Tenn. Ct. App. Sept. 10, 2009). The Court looks at whether the release was wrongly obtained or its language is unclear. *Id.* Second, the Court considers the facts and circumstances surrounding the release's execution. *Id.* This includes the parties' conduct outside litigation. *Id.* And if the release

was wrongly obtained or its language is unclear, then the Court can also consider the parties' statements of their subjective intent. *Id.*

No one claims that the March 2015 release was wrongly obtained, and its language is clear: the release applies to the two companies who signed the release, their successors, and "all other persons, associations, and/or corporations, whether herein named or referred to or not." The only plausible interpretation of this passage is that all parties responsible for Jimmy Kelley's death are released from liability. In proceeding to step two, therefore, the Court will not consider Kenneth Kelley's Declaration about his intent in forming the release.

Kelley's conduct since signing the release creates a genuine issue of material fact about the release's intended scope. As both Kelley and Apria note, Kelley signed three separate releases with various parties. [D. 260 Exs. 1–3]. One of these releases was signed after the one Apria relies on here. If Kelley intended the release at issue here to apply to all parties, it would make little sense for him to sign another release freeing others from liability. Further, Kelley has pursued this litigation since the release was signed. It would likewise make little sense for him to do so if he thought that he had already released Apria. Kelley has shown a genuine issue of material fact about the release's scope.

**B**

Apria next argued that Kelley's suit falls under the Tennessee Health Care Liability Act, Tennessee Code § 29-26-101 to -122. Before filing a suit under the Act, plaintiffs must meet certain notice and certification requirements. TENN. CODE ANN. § 29-26-121 to -122. They must also prove their case through experts who hold very specific qualifications. *Id.* § 29-26-115. Kelley has not met these requirements. So if his suit falls under the Act, it must be dismissed.

5

A suit falls under the Act only if it is a suit "alleging that a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services to a person." *Id.* § 29-26-101(a)(1). On summary judgment, Apria asserted that it was a health care provider that gave Jimmy Kelley health care services. The Court ruled that Apria was not a health care provider because (1) it did not have to be licensed under Tennessee Code title 68, chapter 11; and (2) its respiratory therapists do not practice medicine. Apria contends that this was clear error. On reconsideration, the Court finds for different reasons that Apria is not a health care provider. The Court also finds that Apria did not provide Jimmy health care services.

## 1

The first issue is whether Apria is a health care provider. *Health care provider* is defined in § 29-26-101(a)(2). The two relevant definitions are in subparagraphs (B) and (E). Apria meets neither.

### (A) § 29-26-101(a)(2)(B)

Under subparagraph (B), a health care provider is a "nongovernmental health care facility licensed under title 68, chapter 11." A facility, in turn, is "any institution, place or building providing health care services that is required to be licensed" under title 68, chapter 11. TENN. CODE ANN. § 68-11-201(15). This definition of *facility* presents three questions:

1. Whether Apria is an "institution, place or building";

2. Whether it provides healthcare services at those institutions, places or buildings; and

3. Whether it must be licensed under title 68, chapter 11.

On summary judgment, the Court found that Apria did not meet the third prong; it did not reach the other two. On reconsideration, the Court finds that Apria meets the third prong but not the first two. It is not a facility, and so is not a health care provider under § 29-26-101(a)(2)(B).

6

## (i) Apria Is Not an Institution, Place or Building

A facility is an "institution, place or building." *Id.* § 68-11-201(15). Apria argues that it is an institution, place or building because it has physical locations that support its in-home care efforts. Kelley contends that Apria is not an institution, place or building because it provides only in-home care.

The Court agrees with Kelley. Tennessee law does not define *institution, place or building*. The Court must look for hints in Tennessee law. *Pickard v. Tenn. Water Quality Control Bd.*, 424 S.W.3d 511, 520 (Tenn. 2013). The greatest hints are in § 68-11-201 itself. It uses *institution, place or building* to define three other terms: *ambulatory surgical treatment center*, *hospital*, and *nursing home*. TENN. CODE ANN. § 68-11-201(3), (26)(A), (28)(A). These terms share one defining feature: they are places where people go to receive services.

This is confirmed by § 68-11-201's other uses of *facility*. An outpatient diagnostic center is "a facility providing outpatient diagnostic services." TENN. CODE ANN. § 68-11-201(30)(A). People go to outpatient diagnostic centers to receive services, namely, outpatient diagnostic services.

Similarly, a residential hospice is a "licensed homelike residential facility designed, staffed and organized to provide hospice or HIV care services." *Id.* § 68-11-201(41). Finally, a traumatic brain injury residential home is a "facility . . . in which residential care . . . is provided in a homelike environment to disabled adults suffering from the effects of a traumatic brain injury." *Id.* § 68-11-201(43). The common feature among these treatment centers is that people go to the location to receive the services offered.

This definition of *facility* is further confirmed by the definition of *home care organization*. It is described not as a facility, institution, place, or building, but rather as an "entity." *Id.* § 68-11-

201(17)(A). *Entity* is broader than *institution, place or building*. This reflects the fact that home care organizations go to their customers, not vice versa. *See id.*

The parties make much of the fact that Apria has physical edifices. But a physical edifice is not necessary for an institution or a place—only a building. All that matters is that patients go to the location to receive services. A doctor could set up an office in an empty parking lot. As long as patients come to him there, that parking lot is now an institution, place or building.

Under this definition, Apria is not an institution, place or building. As Apria admits, it offers only equipment for in-home care. Its physical locations merely support its in-home efforts. As a result, these locations are not institutions, places or buildings. They are more like a warehouse that stores equipment for an ambulatory treatment surgical center. As a result, Apria fails the first part of the definition of *facility*.


### (ii) Apria Is Not an Institution, Place or Building Providing Health Care Services

The next question is whether Apria is an institution, place or building "providing health care services." *Id.* § 68-11-201(15).  This question is separate from whether Kelley is suing Apria for failing to provide healthcare services to Jimmy. Here, the Court is concerned only with whether, in general, Apria is an institution, place or building providing health care services.

For two reasons, Apria is not. First, Apria is not an institution, place or building. As a result, it is not an institution, place or building "providing health care services." The clause "providing health care services" is a participle phrase that modifies "institution, place or building." It could be rewritten as "an institution, place or building that provides health care services." Because Apria is not an institution, place, or building, it cannot be an institution, place, or building that provides health care services.

8

Second, even if Apria were an institution, place or building, its locations do not provide health care services. *Health care services* is not defined in § 68-11-201. But *health care* is defined in related regulations. It means "Any care, treatment, service or procedure to maintain, diagnose, treat, or otherwise affect an individual's physical or mental condition, and includes medical care as defined in T.C.A. § 32-11-103(5)." TENN. COMP. R. & REGS. 1200-08-01-.01(32). Section 32-11-103(5), in turn, describes medical care as including "any procedure or treatment rendered by a physician or health care provider designed to diagnose, assess or treat a disease, illness or injury." In other words, health care services are services offered directly to a patient. They do not include the steps that make those services possible. For instance, while respiratory therapy might be a health care service, performing quality control on the respiratory equipment at the warehouse before it is shipped to a patient is not. Thus, even if people came to Apria's locations to receive services, those services would not be health care services. Apria fails the second part of *facility*.

### (iii) Apria Must Be Licensed Under Tennessee Code Title 68, Chapter 11

The final issue is whether Apria must be licensed under Tennessee Code title 68, chapter 11. Apria contends that it must be licensed s a healthcare provider under § 68-11-204(a)(1). Kelley maintains that Apria is exempted from licensing by § 68-11-226(b).

Apria is correct. Apria provides oxygen equipment, a type of home medical equipment. TENN. CODE ANN. § 68-11-201(21)(A)(v). This makes it a home medical-equipment provider. *Id.* § 68-11-201(22). Apria also delivers home medical equipment to people's homes. It is therefore a home care organization. *Id.* § 68-11-201(17)(A)(i)–(iv). And home care organizations must be licensed. *Id.* § 68-11-204(a)(1). Apria must be licensed under title 68, chapter 11.

Kelley asserts that Apria is exempt from licensing by § 68-11-226(b). It states,

> Nothing in this section or in § 68-11-102 or § 68-11-201 or any other law shall require a home medical equipment provider that provides respiratory care equipment and that employs a respiratory care therapist, technician or assistant for the purpose of assisting patients with the use of such equipment to obtain authority as a provider of home health services.

Kelley, focusing on the beginning of the text, argues that Apria is exempt from all licensing because it is a respiratory-care home medical-equipment provider. Apria, focusing on the end, argues that it is exempt from licensing only as a provider of home health services.

The Court agrees with Apria. Section 68-11-226(b) allows certain home medical-equipment providers to operate without being authorized "as a provider of home health services." Granted, home care organizations include both home medical-equipment providers and home health-service providers. *Id.* § 68-11-204(a)(1). But the licensing process is different for the two, even if both are home care organizations. *Compare* Tenn. Code Ann. § 68-11-233 (home health services), *and* Tenn. Comp. R. & Regs. 1200-08-26-.02 (same), *with* Tenn. Code Ann. § 68-11-226(a) (home medical equipment), *and* Tenn. Comp. R. & Regs. 1200-08-29-.02 (same). Section 68-11-226(b) simply says that, if certain organizations go through the licensing process to be a home medical-equipment provider, they do not have to also go through the licensing process to be a home health-service provider. Apria is the kind of home medical-equipment provider described in § 68-11-226(b). It does not need to be licensed as a home health-service provider.

Apria is a home medical-equipment provider that operates as a home care organization. It must therefore be licensed under Tennessee Code title 68, chapter 11. But Apria is not an institution, place or building, nor do its locations provide healthcare services. Apria is not a facility,

and so is not a healthcare provider under § 29-26-101(a)(2)(B). The Health Care Liability act will apply to Kelley's suit only if Apria is a healthcare provider under subparagraph (E).

### (B) § 29-26-101(a)(2)(E)

Apria is not a health care provider under § 29-26-101(a)(2)(E). Subparagraph (E) defines *health care provider* as an entity that has "one or more health care practitioners licensed, authorized, certified, registered, or regulated under any chapter of title 63 or 68." Apria, citing the plain text, notes that its respiratory therapists are licensed under § 63-27-105. Thus, it concludes, its therapists are health care practitioners. Kelley counters that, while Apria's therapists are licensed, they are not health care practitioners.

Respiratory therapists are not "health care practitioners," at least as the phrase is used in the Health Care Liability Act. True, they must be licensed under title 63. But *health care practitioner* does not include every profession listed in titles 63 and 68. *See Mooney v. Sneed*, 30 S.W.3d 304, 307 (Tenn. 2000). Title 63 regulates professions like nursing home administrators and social workers, who do not practice health care. *See* TENN. CODE ANN. §§ 63-16-101(5), -102(a). And title 68 covers more than just professions. It includes laws regulating ski resorts, tanning salons, and nuclear material. *Id.* § 68-114-101 to -108, -117-101 to -107, -202-101 to -709. The Court, then, must take a piecemeal approach to defining *health care practitioner*.

Section 29-26-101(a)(2) itself reveals that respiratory therapists are not health care practitioners. Subparagraph (A) defines *health care provider* as

> A health care practitioner licensed, authorized, certified, registered, or regulated under any chapter of title 63 or title 68, including, but not limited to, medical resident physicians, interns, and fellows participating in a training program of one of the accredited medical

11

schools or of one of such medical school's affiliated teaching hospitals in Tennessee.

This list of examples suggests that *health care practitioner* is limited to those who can practice medicine without oversight by another medical professional (as opposed to a professional board), or are being trained to do so. *See Sallee v. Barrett*, 171 S.W.3d 822, 828–29 (Tenn. 2005).

Apria objects that this definition conflicts with *Mooney*. In *Mooney*, the court ruled that EMTs are health care practitioners. 30 S.W.3d at 307. EMTs are licensed under § 68-14-306. The Practice of Medicine, meanwhile, is governed by § 63-6-201 to -245. If *health care practitioner* is limited to "those who can practice medicine," Apria contends, then it would be limited to those licensed under title 63, chapter 6, which does not include EMTs.

The Court disagrees but heeds Apria's objection. Section 63-6-204(a)(1) defines *practicing medicine* only for purposes of title 63, chapter 6. It does not apply to *health care practitioner* in § 29-26-101(a)(2). Regardless, confusion is possible. So the Court will refine its definition: a *health care practitioner* is someone who can provide medical services without oversight, or is being trained to do so. Among the medical-type professions in titles 63 and 68, this definition makes the following distinctions:

| Title 63 | |
|---|---|
| Health Care Practitioner | Not a Health Care Practitioner |
| Physicians, § 63-6-201(a) | Practical nurses, § 63-7-108 |
| Dentists, § 63-5-108(b) | Dental hygienists, § 63-5-115 |
| Chiropractors, § 63-4-101 | Perfusionists, § 63-28-102(6) |
| Podiatrists, § 63-3-101 | Polysomnographic technologists, § 63-3-101(7) |
| Optometrists, § 63-8-102(12) | |

| Title 68 | |
|---|---|
| Health Care Practitioner | Not a Health Care Practitioner |
| EMTs, § 68-140-309 | Surgical technologists, § 68-57-105 |
| | Poison control center employees, § 68-141-103; TENN. COMP. R. & REGS. 1200-11-06-.04(1), (5)(A) |

*Table 1*

Other Tennessee statutes bear out these distinctions. For example, a custom fitted device is a device worn by a patient "with a prescription from a health care practitioner authorized by law to write such prescriptions." TENN. CODE ANN. § 63-3-201(4). That is, only health care practitioners can write prescriptions. In Table 1, some of the left-side professions can write prescriptions, while none on the right side can. *See also id.* § 49-50-1602(c)(1)(B) (allowing students to have inhalers at school if they provide "a written statement from the prescribing health care practitioner").

Similarly, physical therapists must refer patients to "appropriate health care practitioners, after consultation with the referring practitioner." *Id.* § 63-13-302(a). Only doctors, chiropractors, dentists, podiatrists, and osteopaths can refer patients to physical therapy. *Id.* § 63-13-303(a). Thus, only these professions are "referring practitioners" for physical therapy. These professions fill the left side of Table 1, but not the right side.

Under this definition, respiratory therapists are not health care practitioners. For purposes of § 29-26-101(a)(2)(E), health care practitioners are those who can provide medical services without oversight by a medical professional, or are being trained to do so. Respiratory therapists can practice only with oversight by a physician. *Id.* § 63-27-101(4)(A)(i). They are thus not health

13

care practitioners under § 29-26-101(a)(2)(E). Because Apria does not employ health care practitioners, it is not a health care provider under subparagraph (E). Apria is not a health care provider under the Health Care Liability Act.

Apria asserts that this conclusion would completely remove respiratory therapists from the Act's protection. This concern is overblown. Respiratory therapists who work at hospitals and the like are covered, even if they make house calls. *See id.* § 29-26-101(a)(2)(B)–(C). And a respiratory-care organization that employs a physician is covered. *See id.* § 29-26-101(a)(2)(E). Finally, if a respiratory therapist is employed by a physician, then she is covered. *See id.* § 29-26-101(a)(2)(D). Apria's respiratory therapists are not covered by the Act only because patients do not visit Apria locations, and because Apria does not employ anyone who can provide medical services without oversight. It is only in this narrow situation that respiratory therapists are not covered by the Health Care Liability Act.

**2**

The Health Care Liability Act applies to a suit only when the plaintiff sues a health care provider for the way it provided or failed to provide health care services. Apria is not a health care provider, and so the Act does not apply to Kelley's suit. Nevertheless, the Court will move on to whether Kelley is suing for the way Apria failed to provide health care services.

He is not. Kelley's complaint alleges that Apria failed to do three things:

• teach Jimmy Kelley how to safely use the oxygen equipment;

• look for and fix leaks in the equipment; and

• ensure that Jimmy's environment was suitable for the equipment.

[D. 182 ¶¶ 10–11]. The question is whether any of these amount to health care services.

14

They do not. The only medical professionals that Apria employs are respiratory therapists. Jimmy, however, was never visited by a respiratory therapist. He was seen only by Apria's delivery technicians. And delivery technicians are expressly forbidden from performing the work of respiratory therapists. TENN. CODE ANN. § 63-27-110(a)(2). Jimmy did not receive health care services because the people who visited him could not act on behalf of Apria's medical professionals.

This conclusion finds support in § 68-11-201 itself. It defines *home health service* to include services related to medical supplies and appliances, like what Apria provided Jimmy. *Id.* § 68-11-201(20)(E). But this is only if the supplies or appliances are provided in connection with one of the following:

    (A) Skilled nursing care, including part-time or intermittent supervision;

    (B) Physical, occupational or speech therapy;

    (C) Medical social services;

    (D) Home health aide services.

*Id.* § 68-11-201(20)(A)–(D). Of these, Apria provides only therapy. But Kelley is not suing because of how Apria did or did not provide therapy to Jimmy. Indeed, Apria did not and could not have provided therapy to Jimmy, because he was visited only by delivery technicians. Thus, Kelley is not suing for the way Apria failed to provide health care services.

Granted, Apria's delivery technicians did provide Jimmy with technical instruction on how to use his equipment. They also were tasked with maintaining the equipment and ensuring that the environment was safe for the equipment. These tasks, while technical, were not based in health care. Consider a boy who breaks his leg. He is put into a cast, and his father picks up a pair of metal crutches from the store. At home, the father adjusts the crutches for the boy and shows him

15

how to use them. And when it rains, the father dries the crutches so they don't rust, and he cleans up puddles on the floor so that the boy does not slip. In this scenario, the father is not providing health care services to his son. Similarly, Apria's delivery technicians did not provide health care services to Jimmy.

Apria's argument here relies much on two cases, but neither applies to Apria's situation. First is *Osunde v. Delta Medical Center*, No. W2015-1005-COA-R9-CV, 2016 WL 537075 (Tenn. Ct. App. Feb. 10, 2016). In *Osunde*, the court had to decide whether the plaintiff's suit fell under the Health Care Liability Act. *Id.* at *9. The plaintiff had been getting an x-ray at a hospital. *Id.* at *1. As part of the procedure, the radiology technician told her to stand on a stool. *Id.* The plaintiff fell off the stool and was injured. *Id.* She sued the hospital. *Id.* at *2.

The court ruled that the Act applied to her suit. *Id.* at *9. It found that the hospital was a health care provider and the x-ray technician was its "employee" under § 29-26-101(a)(2)(D). *Id.* Further, the technician's act of providing the stool to the plaintiff counted as a health care service. *Id.* The court's entire reasoning was that "the provision of the stool in connection with the x-ray qualifies as a 'health care' service because such services include 'staffing, custodial or basic care, position, hydration and similar patient services.'" *Id.*

*Osunde* does not bear on this suit. Apria has not argued that it is a health care provide under subparagraph (D). And the court's analysis about health care services is vague at best. There could be many reasons why the court reached its conclusion. Perhaps the x-ray was clearly a health care service, and providing the tool was "related to the provision of . . . health care services." TENN. CODE ANN. § 29-26-101(a). Maybe providing the stool for the patient counted as "positioning" for the x-ray. Or the court could have meant that the simple act of providing a stool

16

for a patient counts as "similar patient services." Without more, the Court cannot conclude that *Osunde* is useful for defining *health care services*.

The other case Apria relies on is *San Antonio Extended Medical Care, Inc. v. Vasquez*, 327 S.W.3d 193 (Tex. App. 2010). In *Vasquez*, the court ruled that an oxygen-delivery company was a health care provider under Texas law. *Id.* at 198. Texas law defined *health care provider* as a "person, partnership, professional association, corporation, facility, or institution duly licensed, certified, registered, or chartered by the State of Texas to provide health care." *Id.* at 197 (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(12)(A)). The company was licensed as a prescription drug maker. *Id.* at 198. This was the same license held by pharmacies. *Id.* Thus, the court concluded, the oxygen-delivery company was a health care provider. *Id.*

*Vasquez* does not apply here because Tennessee's licensing laws are different. Apria is licensed as a home care organization providing medical equipment. Such organizations are licensed under Tennessee Regulations 1200-08-29-.02. These rules govern only home care organizations providing medical equipment. A home-care-organization license does not give permission to do anything else.

Apria did not provide health care services to Jimmy Kelley. Apria is also not a health care provider. Kelley's suit, therefore, does not fall under the Health Care Liability Act. His failure to meet the Act's notice and certification requirements does not end his suit. And any expert witnesses he offers will not have to meet the Act's qualifications.

17

## C

On summary judgment, Apria argued that Kelley could not prove his negligence claim through res ipsa loquitur. The Court disagreed. On reconsideration, Apria contends that Kelley's claim fails in two ways: he has not shown that it was Apria who was probably negligent, and he has not clearly made out a genuine issue of material fact on the second element of res ipsa loquitur.

There are three problems with this new argument. First, it cannot be raised on a motion to reconsider. According to Apria, it was clear error of law for the Court to find enough facts for Kelley's res ipsa loquitur claim to go forward. In other words, Apria claims that the Court applied the law to incorrect facts. "Clear error of law," however, means the opposite: application of incorrect law to the facts. *See Kelso v. City of Toledo*, 77 F. App'x 826, 832 (6th Cir. 2003). Apria's argument does not belong here.

Second, Apria's argument misunderstands the law twice over. For one, it asserts that Kelley has not shown two things: that it was Apria who was probably negligent, and that Jimmy's injury was of a kind that normally does not occur without negligence. To be sure, Kelley must prove "(1) that the injury was probably the result of negligence, even though the exact nature of the negligence is unknown; and (2) that it was probably the defendant who was the negligent person." *Burton v. Warren Farmers Coop.*, 129 S.W.3d 513, 523 (Tenn. Ct. App. 2002). But he need not prove these facts directly. Instead, all that matters is whether Kelley shows these three elements:

- how the harm occurred;

- that the harmful event is "of a kind which does not ordinarily occur in the absence of negligence"; and

- that the harm came from an instrumentality within the defendant's exclusive control.

18

*Id.* at 524–25. Kelley does not have to directly prove that it was Apria who was probably negligent.

Indeed, were Kelley forced to directly prove this, it would undermine the doctrine of res ipsa loquitur. "Plaintiffs relying on res ipsa loquitur need not prove specific acts of negligence by the defendant to get their case to the jury. They may instead base their case on the circumstances surrounding the injury . . . ." *Id.* at 523 (citation omitted). Were Kelley required to directly prove that it was Apria who was probably negligent, he would be forced to prove specific acts of negligence by Apria.

For another, Apria's argument mischaracterizes the second element. The second element of a res ipsa loquitur claim is that "the event causing the injury is of a kind which does not ordinarily occur in the absence of negligence." *Id.* at 525. This element does not care *who* was negligent. Thus, Kelley did not have to show that the fire would not ordinarily occur in the absence of *Apria's* negligence.

This interpretation can be seen in the traditional role and effect of res ipsa loquitur claims. "The doctrine of res ipsa loquitur has traditionally been available in cases where direct evidence of a defendant's negligence is either inaccessible to or unknown by the plaintiff." *Seavers v. Methodist Med. Ctr. of Oak Ridge*, 9 S.W.3d 86, 91 (Tenn. 1999). Kelley's suit is exactly that type of case: because of the severe fire damage, even the fire investigators could not determine what caused the fire. [D. 151 Ex. 3 at 3]. Res ipsa loquitur allows Kelley's claim to reach the jury anyway.

The effect of res ipsa loquitur confirms this reading too. "When the doctrine is applied, while it relieves the plaintiff from proving the defendant guilty of specific negligence, it does not relieve the plaintiff of the responsibility of proving the defendant at fault, and the inference can

be rebutted by proof that the defendant exercised reasonable care." *Summit Hill Assocs. v. Knox-ville Utils. Bd.*, 667 S.W.2d 91, 96 (Tenn. Ct. App. 1983). As a result, a plaintiff who satisfies the three res ipsa loquitur elements must still prove that the defendant's conduct caused his injury. *Burton*, 129 S.W.3d at 526. Whether Kelley has shown a genuine issue on causation is beside the point of his res ipsa loquitur claim.

Finally, at bottom, Kelley has stated a genuine issue of material fact on the second element of his res ipsa loquitur claim. Kelley must show that the fire would not ordinarily have occurred without negligence. The touchstone of this element is "common knowledge or understanding." *Seavers*, 9 S.W.3d at 91. It is commonly known that oxygen equipment does not explode without someone being at least negligent. Kelley properly alleges this fact, and the record supports it. [D. 182 ¶ 25; D. 262 Ex. 4 at 4, 7–9, Ex. 5 at 4–5]. Kelley has shown a genuine issue on the second element of his res ipsa loquitur claim.

On reconsideration, Apria does not challenge the first or third element of Kelley's claim. The Court found that each element was properly alleged and supported, and the Court affirms that finding. The first element of a res ipsa loquitur claim is how the injury happened. *Burton*, 129 S.W.3d at 524. Kelley's complaint alleges that Jimmy was killed by a fire, and expert testimony supports this. [D. 182 ¶¶ 14–15; D. 162 Exs. 1–2].

Kelley also properly alleged and supported the third element. This element requires Kelley to show that the harm came from an instrumentality within Apria's exclusive control. *Burton*, 129 S.W.3d at 525. The parties, though, dispute how to characterize this element. Apria cites the standard from *Fulton v. Pfizer Hospital Products Group.*, 872 S.W.2d 908 (Tenn. Ct. App. 1993). According to *Fulton*, to satisfy the third res ipsa loquitur element, "the nature and circumstances of the accident must be of such character that there could be no reasonable inference but

20

that the injury complained of was due to the defendant's negligence or from the negligence of others for whose actions the defendant is legally responsible." *Id.* at 912. Apria argues that this "no reasonable inference" test is the proper measure of the final res ipsa loquitur element.

This argument overlooks post-*Fulton* changes in the law. Since *Fulton*, its restrictive test has fallen out of favor. The Tennessee Court of Appeals walked *Fulton* back in *Burton*, acknowledging that *Fulton*'s test "is unduly restrictive because it effectively requires a plaintiff to prove a civil case beyond a reasonable doubt." 129 S.W.3d at 523 n.4. Ultimately, *Burton* noted that "Tennessee's courts do not view 'exclusive control' as indispensable to the application of the res ipsa loquitur doctrine." *Id.* at 525.

Instead, the proper measure is whether the defendant had a duty to the plaintiff to anticipate or guard against whatever caused the injury. *Id.* The Sixth Circuit has recognized these two versions of the exclusive-control element and ruled that *Fulton*'s approach is inappropriate. *Morris v. Wal-Mart Stores, Inc.*, 330 F.3d 854, 857–62 (6th Cir. 2003); *see also Callahan v. Boozer*, No. 3:04-cv-27, 2005 WL 1712133, at *4 (E.D. Tenn. July 21, 2005) (Shirley, Mag.) (citing *Morris* and *Burton* and taking less restrictive approach). What matters here, then, is whether Apria had a duty to Jimmy to anticipate or guard against the fire.

Kelley has properly alleged that Apria did have a duty, and the record supports that allegation. [D. 182 ¶ 26; D. 262 Ex. 3 at 38:19–24, 134:19–135:7]. Kelley's res ipsa loquitur claim survives both summary judgment and reconsideration.

**D**

Apria next renews its challenge to Kelley's claim of negligence per se. Kelley bases his claim

on the standards laid down by the Centers for Medicare and Medicaid Services ("CMS") and the

Joint Commission. On summary judgment, Apria contended that these standards can never serve

as the basis for negligence per se. The Court disagreed, finding no reason to categorically disap-

prove of them. On reconsideration, Apria renews its arguments and offers new ones.

Apria first tries to broaden its old argument by reframing it. Apria "submits that it was clear

error for the Court to conclude that the Plaintiff had successfully plead [sic] a claim for negli-

gence per se without assessing whether the Plaintiff had met the elements of a negligence per se

claim under Tennessee law." [D. 286 at 15]. This is disingenuous. In fact, Apria originally chal-

lenged only the first element, not all of them. Apria actually concluded its summary-judgment

argument with "the Plaintiff's attempt to bring a negligence *per se* claim fails because he cannot

establish the first element." [D. 258 Ex. 1 at 21]. The Court, therefore, considered only the first

element in denying summary judgment on Kelley's claim of negligence per se.

Nevertheless, the Court affirms its holding that Joint Commission standards may be cited to

prove negligence per se. Apria contends that it was clear error for the Court to reach this conclu-

sion. The core of its argument is that Joint Commission accreditation is simply one way to com-

ply with state and federal licensing requirements. Thus, Apria concludes, Joint Commission

standards lack the force of law and may not be used for negligence per se.

The Court disagrees. When it comes to negligence per se, there are two groups of rules. On

the one hand are statutes, ordinance, and regulations, which can set the standard of care for negli-

gence per se. *See Smith v. Owen*, 841 S.W.2d 828, 831 (Tenn. Ct. App. 1992); *Russell v. Ander-

son Cty.*, No. E2010-189-COA-R3-CV, 2011 WL 486900, at *11 (Tenn. Ct. App. Feb. 11,

2011). On the other hand are internal policies and procedures, which can be evidence of the standard but cannot outright define it. *See Gross v. Nashville Gas Co.*, 608 S.W.2d 860, 869–70 (Tenn. Ct. App. 1980). On summary judgment, the Court found that Joint Commission standards belong in the first group.

On reconsideration, the Court affirms this conclusion. The deciding factor is that Joint Commission standards have been incorporated by reference into Tennessee law. Home medical-equipment providers accredited by the Joint Commission are presumed to comply with the state's licensing requirements. TENN. CODE ANN. § 68-11-226(a); TENN. COMP. R. & REGS. 1200-08-29-.04(5). If a provider loses accreditation, then the presumption disappears and the provider is no longer authorized to operate. The provider must then become licensed as laid out in Tennessee law. *See* TENN. COMP. R. & REGS. 1200-08-29-.02(2). If the provider does not, then it is breaking the law. TENN. CODE ANN. § 68-11-213(h). Through incorporation by reference, Joint Commission standards have the backing of Tennessee criminal law.

Joint Commission standards are comparable to local building codes. Building codes can be used to prove negligence per se. *See, e.g.*, *Pittenger v. Ruby Tuesday, Inc.*, No. M2006-266-COA-R3CV, 2007 WL 935713, at *4–5 (Tenn. Ct. App. 2007). But some building codes are private. For example, the building code for Smyrna, Tennessee, reads, "The International Building Code, 2006 edition, and amendments thereto, is hereby adopted and incorporated by reference as part of this municipal code, and is hereinafter referred to as the building code." SMYRNA MUN. CODE § 12-101. The International Building Code is published by the International Code Council, Inc. *The I-Codes*, INTERNATIONAL CODE COUNCIL, goo.gl/r49ssX (last visited Jan. 30, 2017). Yet were a Smyrna landlord to violate the building code through his negligence, it would make little sense for him to get off scot-free because a private group wrote the code. *See, e.g.*, *Smith v.*

23

*ACME Mkts., Inc.*, No. Civ.A.02C7-002SCD, 2003 WL 1858169, at *1 (Del. Super. Ct. Apr. 4, 2003) (rejecting negligence per se claim based on private building code because it had not been adopted into law); *Siegel v. Park Ave. Condo. Ass'n, Inc.*, 744 S.E.2d 876, 879–80 (Ga. Ct. App. 2013) (accepting that International Building Code can be used for negligence per se but rejecting claim for lack of causation). The same goes for Joint Commission standards.

Indeed, there are not just state penalties at stake. The federal government is involved too. The Secretary of Health and Human Services must treat health organizations as fully accredited if (1) they meet the standards of a national accreditation body, and (2) that body's standards satisfy the requirements contained in the Social Security Act's Medicare and Medicaid provisions. 42 U.S.C. § 1395bb(a)(1)(A). The Joint Commission meets both requirements. *See, e.g., Nat'l Ass'n of Psychiatric Health Sys. v. Shalala*, 120 F. Supp. 2d 33, 35 (D.D.C. 2000). The Secretary, then, must treat health organizations as accredited under federal law if they are accredited by the Joint Commission.

This includes Apria. Home health agencies are considered health organizations. 42 U.S.C. § 1395bbb(a)(5); 42 C.F.R. § 484.12(c). Under federal law, Apria is a home health agency. 42 U.S.C. § 1395x(o) (defining "home health agency"). And it is accredited by the Joint Commission. [D. 262 Ex. 3 at 15:2–6]. Thus, the Secretary of Health and Human Services must treat Apria as accredited under federal law.

As a result, if Apria did not comply with Joint Commission standards, then it could be punished by the Tennessee and federal governments. If Apria were to lose Joint Commission accreditation and it did not get a license in another way, then it could not operate without committing a misdemeanor. TENN. CODE ANN. § 68-11-213(h). And if that were to happen, then the federal government could revoke Apria's ability to accept Medicare and Medicaid payments. *See* 42

U.S.C. §§ 1395cc(b)(2)(B), 1395x(o)(4). This can have devastating consequences. *See Cospito v. Heckler*, 742 F.2d 72, 75–78 (3d Cir. 1984). Joint Commission standards are incorporated by reference into Tennessee law and so can be enforced by Tennessee authorities. They can be treated like statutes, ordinances, and regulations for negligence per se.

To be sure, Apria does cite three cases ruling that Joint Commission standards cannot set the standard for negligence per se. But none is persuasive. First is *Welsh v. United States*, 844 F.2d 1239 (6th Cir. 1988), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009) (en banc). In *Welsh*, the court noted that, although violations of Joint Commission standards do not constitute negligence per se in Tennessee, they may be used as evidence of negligence. 844 F.2d at 1244. *Welsh*, however, predated the standards' incorporation into Tennessee law. *See* Act of Apr. 27, 1995, ch. 244, § 5, 1995 Tenn. Pub. Acts 369, 371 (codified at § 68-11-226(a)). They did not have the backing of Tennessee law at the time *Welsh* was decided.

Second is *Langbehn v. Public Health Trust of Miami-Dade County*, 661 F. Supp. 2d 1326 (S.D. Fla. 2009). The *Langbehn* court stated that Joint Commission standards were merely internal policies, "not statutes enacted by the legislature or regulations duly issued by an administrative agency." *Id.* at 1344. And at the time, Joint Commission standards were incorporated into Florida law. But all that Joint Commission accreditation offered was an alternative to state inspection during the licensing process. *See* FLA. STAT. ANN. §§ 395.002(1), 395.003, 408.806 (2008); FLA. ADMIN. CODE ANN. r. 59A-3.066(2)(d)(1) (2008). The only way to be licensed remained through the state.

More important, though, is the *Langbehn* court's failure to explain why Joint Commission standards were not statutes or regulations despite being incorporated into law. In light of the

lesser role Joint Commission standards played in Florida law, the lack of analysis, and the Court's reasoning above, the Court does not find *Langbehn* convincing.

Apria's final case is *Frank v. Cascade Healthcare Community, Inc.*, No. 6:11-cv-6402-AA, 2013 WL 867387 (D. Or. Mar. 6, 2013). In *Frank* the court noted,

> JCAHO's guidelines are insufficient to fix the legal standard of conduct and create a civil cause of action under Oregon law; in fact, the parties have not cited to, and the Court is not aware of, any precedent that has permitted a negligence per se claim to proceed based on anything other than a statute or regulation.

*Id.* at *9. In Oregon at the time, Joint Commission standards carried a fair amount of weight in hospital licensing and operation. *See, e.g.*, OR. REV. STAT. ANN. §§ 441.062(3), 443.019(2) (2011); OR. ADMIN. R. 333-500-0020, -0040, -501-0030 (2011). But the court did not say why these guidelines could not be considered statutes or regulations. And, in fact, there was a previous case holding that Joint Commission standards could be used to fix the standard of care in a negligence suit against a hospital. *See Pedroza v. Bryant*, 677 P.2d 166, 170–71 (Wash. 1984) (en banc). In light of this and everything that has been said above, the Court puts little weight in *Frank*. Under Tennessee law, Joint Commission standards may be used to fix the standard of care in negligence per se claims.

Apria levels two objections, but neither is convincing. First, it is true that there are several ways to become licensed as a Tennessee home care organization. *See* TENN. COMP. R. & REGS. 1200-08-29-.02, -.04(5). But that does not mean that the rules defining each way are any less "laws." For instance, in Tennessee it is illegal to practice law without permission from the state. TENN. CODE ANN. § 23-3-103. And there are many ways to obtain this permission, such as:

• Become licensed to practice law in Tennessee. TENN. SUP. CT. R. 7, § 1.01(a).

26

• Obtain a waiver to practice in Tennessee. *Id.* § 5.01(a).

• Obtain permission from Tennessee courts to appear pro hac vice. *Id.* 19.

No one is forced to take one way over the other to become licensed. But if none is taken, then the attorney is breaking the law. Similarly, there are many ways to legally operate as a Tennessee home care organization providing medical equipment. There is no legal obligation to pick a certain procedure. But if none is picked, then the organization is breaking the law. TENN. CODE ANN. § 68-11-213(h).

Second, it does not matter that the Joint Commission is a private organization. If an attorney wants to take the Tennessee bar exam, she must have attended an accredited law school. Tennessee recognizes two types of accreditation: provisional accreditation through the state, or full accreditation through the American Bar Association. TENN. SUP. CT. R. 7, §§ 2.02, 2.03. If a would-be lawyer cannot show that she attended a law school accredited by the state or by the ABA—a private organization—then she cannot take the bar exam. Likewise, if a would-be home care organization cannot show that it meets the state's requirements or is accredited by the Joint Commission, then it cannot operate. What matters is that a private organization's rules have been approved by Tennessee and incorporated into its laws.

Apria offers two new arguments in its motion to reconsider. First is a narrower version of its old argument. Apria contends that, even if Joint Commission standards broadly can provide the basis for negligence per se, the specific ones that Kelley relies on cannot. Second, Apria asserts that Kelley's claim should have been dismissed for failure to allege the first element of negligence per se. These arguments, however, were not made in Apria's motion for summary judgment. And "under Rule 59(e), parties cannot use a motion for reconsideration to raise new legal arguments that could have been raised before a judgment was issued." *Roger Miller Music, Inc.*

*v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 395 (6th Cir. 2007). The Court will not consider them now.

Finally, Apria renews its argument that CMS rules are too vague for negligence per se. This argument was fully offered and considered on summary judgment. It will not be revisited. CMS regulations are not, as a group, too vague to fix the standard of care for negligence per se.

Apria's argument relies on *Brown v. Sun Health Care Group, Inc.*, 476 F. Supp. 2d 848 (E.D. Tenn. 2007) (Varlan, C.J.), and *Conley v. Life Care Centers of America, Inc.*, 236 S.W.3d 713 (Tenn. Ct. App. 2007). Both cases held that federal nursing-home regulations were too vague to use in negligence per se actions. *Brown*, 476 F. Supp. 2d at 851–52; *Conley*, 236 S.W.3d at 733. Both cases, however, were limited to federal nursing-home regulations.

Further, *Brown* and *Conley* were medical malpractice actions. Under the Tennessee Health Care Liability Act, these cases must be based on a local standard of care. Tenn. Code Ann. § 29-26-115(a)(1). *Brown* and *Conley* held that nationwide federal regulations cannot define a local standard of care. *Brown*, 476 F. Supp. 2d at 852; *Conley*, 236 S.W.3d at 734. Kelley's claim, however, does not fall under the Act. *Brown* and *Conley* have no bearing on this case.

Outside of the medical malpractice context, Tennessee courts have used federal rules to define the standard of care in negligence per se actions. *See, e.g.*, *Payne v. CSX Transp., Inc.*, 467 S.W.3d 413, 435–36 (Tenn. 2015); *Ownby v. Tenn. Farmers Coop. Corp.*, No. M2008-878-COA-R3-CV, 2009 WL 1392574, at *4 (Tenn. Ct. App. May 18, 2009). Medicare and Medicaid regulations are federal rules. Kelley may use them for his negligence per se claim.

**E**

Finally, Apria asserted that summary judgment should be granted against Kelley's claim for punitive damages. The Court disagreed, finding a genuine issue about whether there was clear and convincing evidence that Apria acted intentionally, fraudulently, maliciously, or recklessly. Apria contends that this was clear error.

The Court disagrees. To recover punitive damages, the plaintiff must show by clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously, or recklessly. *Sanford v. Waugh & Co., Inc.*, 328 S.W.3d 836, 848 (Tenn. 2010). When clear and convincing evidence is required, the Court considers whether a jury could reasonably conclude that the plaintiff has met this burden. *See Anderson*, 477 U.S. at 255. "Clear and convincing" means that the truth of what's alleged is "highly probable." *Teter v. Republican Parking Sys., Inc.*, 181 S.W.3d 330, 341 (Tenn. 2005).

Kelley has shown a genuine issue of material fact on this issue. He is greatly helped by Federal Rule of Civil Procedure 56. A party asserting that a fact is disputed must support that assertion either by citing material in the record, or by showing that the materials the other party cites do not establish a lack of dispute. FED. R. CIV. P. 56(c)(1). As to punitive damages, Kelley's statement of facts cites material in the record. Apria's response and its own statement, by contrast, wholly fail to cite the record or show why Kelley's citations do not support his claim for punitive damages. The Court thus finds that Kelley has stated a genuine issue on all facts he backs with a citation. *See id.* 56(e)(2).

Under the clear and convincing evidence standard, these undisputed facts show a genuine issue about whether a jury could reasonably award Kelley punitive damages. Kelley asserts that Apria's delivery technicians always indicated that the patient's home was suitable for oxygen,

29

regardless of actual suitability. [D. 269 ¶ 36]. In support, Kelley cites the testimony of Jonathan

Surcey, one of Apria's delivery technicians who visited Jimmy. Surcey testified as follows:

> Q. So you would have met with Mr. Kelley on this particular day and checked out
> to make sure his place was a proper place to use all this equipment you were
> bringing?
>
> A. I was always instructed to check "environment suitable, yes."
>
> . . . .
>
> Q. Okay. When you say you were instructed to always mark "environment suita-
> ble," what do you mean by that?
>
> A. That is what I was instructed.
>
> Q. By who?
>
> A. I would assume Jesse Kassner, whoever would have been my supervisor. That
> would have been Jesse Kassner.
>
> Q. And they would have told you to always check "environment suitable"?
>
> A. Yes, sir.

[D. 258 Ex. 5 at 84:20–25, 85:4–19]. This reveals a genuine issue of material fact about whether

Apria's employees acted at least fraudulently or recklessly.

Apria takes issue with this connection. According to Apria, Surcey's admission that he was

always told to check "yes" does not mean that he actually did always check "yes." This argu-

ment, however, is unconvincing. On summary judgment, the Court must draw all reasonable in-

ferences in Kelley's favor. *Anderson*, 477 U.S. at 255. The clear implication from Surcey's testi-

mony is that, because he was instructed to always check "yes," he in fact always did so.

This inference finds support in the testimony of Jesse Kassner, Surcey's supervisor.[1] He testified that, in all his time at Apria overseeing the technicians' deliveries, he never saw the "Environment Suitable" box checked "no." [D. 258 Ex. 5 at 70:11–25]. If Surcey was told to always check "yes," and Kassner never saw a box checked "no," then Surcey must have always checked "yes." A reasonable jury could find by clear and convincing evidence that Apria's employees acted fraudulently or recklessly.

Finally, to demand more would require that Surcey outright admit wrongdoing. But the Court rejects "the implication that punitive damages cannot be awarded unless a defendant admits its wrongdoing." *LaMore v. Check Advance of Tenn., LLC*, No. E2009-442-COA-R3-CV, 2010 WL 323077, at *8 (Tenn. Ct. App. Jan. 28, 2010). Circumstantial evidence is enough. Kelley has stated a genuine issue of fact about his claim for punitive damages.

On reconsideration, Apria makes two counterarguments. Neither is convincing. First, Apria contends that the evidence of intent, fraud, malice, or recklessness "must, by definition, speak to the alleged actor's state of mind, not just the actor's conduct." [D. 286 at 18]. This is true. But state of mind can be inferred from conduct. *See, e.g.*, *LaMore*, 2010 WL 323077, at *8. Surcey's and Kassner's testimony about their conduct speaks to their states of mind.

Second, Apria "contends that simply citing to the record does not satisfy the burden under Fed. R. Civ. P. 56(1)(A) [sic]." [D. 286 at 22]. This makes no sense. A party can show a genuine dispute by "citing to particular parts of materials in the record." FED. R. CIV. P. 56(c)(1)(A). Of course, the cited material must support the point that the party is trying to make. But Kelley has done that. His claim for punitive damages survives summary judgment and reconsideration.

---

[1] Though Kelley did not cite Kassner's testimony, the Court may consider it. FED. R. CIV. P. 56(c)(3).

# IV

Apria asks the Court to reconsider its Order denying summary judgment. For the reasons stated above, the Court has reconsidered some parts of its ruling but not others. The outcome is the same. Apria asks, in the alternative, to certify the Order for interlocutory appeal under 28 U.S.C. § 1292(b). It argues that this case presents the proper conditions for interlocutory appeal.

The Court disagrees. Interlocutory appeal is warranted only when it "may materially advance the ultimate termination of litigation." *Id.* As a result, "Interlocutory appeal is most appropriate early in the proceedings. By contrast, the role of interlocutory appeal is diminished when a case is nearing trial and large expenditures have already been made." *W. Tenn. Chapter of Associated Builders & Contractors, Inc. v. City of Memphis*, 138 F. Supp. 2d 1015, 1026 (W.D. Tenn. 2000); *see also U.S. ex rel. Martin v. Life Care Ctrs. of Am., Inc.*, Nos. 1:08-cv-251, 1:12-cv-64, 2014 WL 12638480, at *4 (E.D. Tenn. Nov. 24, 2014) (Mattice, J.). Trial in this case is merely days away. Allowing the original Order to be appealed before trial would significantly stall its termination, not advance it. Apria's request for certification under 28 U.S.C. § 1292(b) is denied.

\* \* \* \* \*

For these reasons, Apria's motion to reconsider [D. 286] is **GRANTED in part** and **DENIED in part**. The Court's previous summary-judgment Order [D. 282] is **VACATED** and **REPLACED** with this Order. Apria's request to certify the previous Order for interlocutory appeal is **DENIED**. Apria's motion for summary judgment [D. 258] is **DENIED**.

**IT IS SO ORDERED.**

_____
**UNITED STATES DISTRICT JUDGE**