UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| **Kenneth Kelley, as the son, next of kin, and heir at law of JIMMY KELLEY, deceased,** | ) ) ) |
| *Plaintiff*, | ) ) |
| v. | ) ) | 
| **APRIA HEALTHCARE, LLC,** | ) ) ) |
| *Defendant*. | ) |

No. 3:13-cv-96
Reeves/Guyton

### Memorandum Opinion and Order

Jimmy Kelley lived in a camper on property occupied by his son Kenneth. Jimmy, in his early seventies, used medical oxygen and equipment provided by Apria Healthcare, LLC. In February 2012, a fire broke out in the camper. Jimmy was killed.

Kenneth sued Apria and others. All defendants settled except Apria. After a five-day trial, a jury returned a verdict for Kenneth. The jury found that Apria was negligent, and that its negligence was 51% to blame for Jimmy's death. Kenneth was awarded $1 million in damages for the suffering Jimmy experienced before dying and $1.5 million for the value of Jimmy's life.

Now before the Court are Apria's post-trial motions:

1. A motion for a post-trial directed verdict, new trial, or reduction in damages;
2. A motion for a reduction in damages; and
3. A motion for relief from costs.

For the reasons that follow, the first and third motions will be denied, and the second will be granted. Kenneth's damages will be reduced to $750,000.

# I

First, Apria asks that the Court override the jury verdict and enter judgment in its favor. Alternatively, Apria requests a new trial or a lowering of the jury award for the value of Jimmy's life. The Court sees no basis for second-guessing the jury verdict, and the award for Jimmy's life will not be reduced.

## A

Apria offers eight reasons why the Court should enter judgment in its favor. But first, the Court must address two other points. First, Apria has renewed its overruled objections and motions by simply saying that it "hereby renews" them. [D. 392 at 2]. It offers no reason why the Court should revisit those objections and motions. And a "party waives issues that it adverts to in a perfunctory manner, unaccompanied by some effort at developed argumentation." *Thomas v. United States*, 849 F.3d 669, 679 (6th Cir. 2017). The Court will not revisit those objections and motions.

Second, Apria says that it has not yet been served with an actual signed judgment. Thus, it reserves the right to file a Rule 50, Rule 59, or Rule 60 motion once it has been served. A signed judgment, however, has been entered on ECF. [D. 375]. Notice of a judgment is served according to Federal Rule of Civil Procedure 5(b). FED. R. CIV. P. 77(d)(1). Under Rule 5(b), a party can be served electronically if it consents in writing. *Id.* 5(b)(2)(E). Registering as a user on ECF constitutes consent to electronic service of all documents. ELECTRONIC CASE FILING RULES AND PROCEDURES FOR THE EASTERN DISTRICT OF TENNESSEE 8, perma.cc/M8BB-KRDF (last visited June 19, 2017). Apria has so registered. And the ECF-generated notice of a judgment being electronically filed constitutes service of the judgment as soon as the notice goes out. *Id.* at 10; *see* FED. R. CIV. P. 5(b)(2)(E). According to the receipt attached to the signed judgment on ECF, the notice went out on February 22, 2017. Apria was thus served with an actual signed judgment on February 22.

**B**

Apria has moved for a post-trial directed verdict in its favor under Rule 50(b). The Court had this case through diversity jurisdiction, and Apria's Rule 50(b) arguments are based on the sufficiency of the evidence. In a diversity case, when a Rule 50 motion is based on the sufficiency of the evidence, the Court applies the standard of review from the state whose substantive law governs. *American Trim, LLC v. Oracle Corp.*, 383 F.3d 462, 471 (6th Cir. 2004). Tennessee law governs this suit, so the Court will apply its standard for motions for a post-trial directed verdict.

In ruling on a motion for a post-trial directed verdict, "the court must take the strongest legitimate view of the evidence in favor of the non-moving party." *Eaton v. McClain*, 891 S.W.2d 587, 590 (Tenn. 1994). To do so, the court must resolve any conflict in the evidence by construing it in the light most favorable to the nonmoving party and disregarding all countervailing evidence. *Id.* The court may then grant the motion only if "reasonable minds could not differ as to the conclusions to be drawn from the evidence." *Id.*

Apria has alternatively moved for a new trial under Rule 59. A new trial is warranted when the jury reaches a "seriously erroneous result," as shown by (1) the verdict being against the clear weight of the evidence; (2) excessive damages; or (3) the trial being influenced by prejudice or bias against the nonmoving party. *Cranpark, Inc. v. Rogers Grp.*, 821 F.3d 723, 737 (6th Cir. 2016). If a party argues that the verdict is against the clear weight of the evidence, the court must decide if the verdict was unreasonable. *Id.*

**C**

**1**

Apria first argues that Kenneth's suit falls under the Tennessee Health Care Liability Act, and so should have been dismissed for not complying with it. On summary judgment and on reconsideration, the Court ruled that, under the Act, Apria was not a health care provider providing health care services. *Kelley v. Apria Healthcare, LLC*, ___ F. Supp. 3d ___, 2017 WL 473882, at *9 (E.D. Tenn. 2017). Again, Apria argues against this conclusion.

Again, its arguments are unconvincing. *See In re Moncier*, 488 F. App'x 57, 57 (6th Cir. 2012) ("No means no."). A suit falls under the Act if it alleges that a "health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services." TENN. CODE ANN. § 29-26-101(a)(1). First, Kenneth's suit was not related to the provision of, or failure to provide, health care services. Apria brought Jimmy his equipment, taught him how to use it, and ensured that the environment was safe for the equipment. The Court ruled that these were not health care services. *Kelley*, 2017 WL 473882, at *7. Apria contends that these services were related to the provision of prescribing medical oxygen, a health care service.

The Court disagrees. To be sure, prescribing medical oxygen is a health care service. But Apria's reading of "related to" is too broad. For one, it overlooks the fact that Jimmy was visited only by delivery technicians. The only health care workers Apria employs are respiratory therapists. And Tennessee law expressly bans delivery technicians from doing the work of respiratory therapists. TENN. CODE ANN. § 63-27-110(a)(2). So Jimmy could not have received health care services from Apria.

For another, Apria's approach contains no limiting principle. Under its reading of "related to," the Act would cover instances when a delivery technician rear ends a customer's car while pulling into the customer's driveway. Were the customer to sue the driver, she would have to prove her case with expert healthcare witnesses licensed in Tennessee or a bordering state *Id.* § 29-26-115(b). Of course, there would be little point in bringing healthcare experts into a fender-bender suit. Yet Apria's reading of "related to" would require it. Kenneth's suit is not related to the provision of, or failure to provide, health care services.

Nor is Apria a health care provider. Under Tennessee Code § 29-26-101(a)(2)(B), a health care provider is a "nongovernmental health care facility licensed under title 68, chapter 11." And a facility is "any institution, place or building providing health care services that is required to be licensed" under title 68, chapter 11. *Id.* § 68-11-201(15). This definition presents three requirements:

1. that Apria be an institution, place or building;

4

2. that it provide health care services as an institution, place or building; and

3. that is must be licensed under title 68, chapter 11.

The Court ruled that Apria met the third requirement but not the first two. *Kelley*, 2017 WL 473882, at *3. As for the first requirement, the Court read *institution, place or building* to mean places where people go to receive services. Apria points to trial testimony that people visit Apria locations to receive services. On this point, Apria is right. Tr. at 721:4–25.

Apria also contends that the services people receive at its locations are health care services. The evidence, however, says otherwise. By the time Jimmy died, people would visit Apria locations to pick up equipment, learn how to use their equipment, and have their equipment serviced. *Id.* But these were exactly the services that Apria provided Jimmy at his home. As explained above, these were not health care services. *See also Kelley*, 2017 WL 473882, at *7.

Apria tries to counter this conclusion by renewing its argument based on *Osunde v. Delta Medical Center*, 505 S.W.3d 875 (Tenn. Ct. App. 2016). The Court, however, has already rejected that argument. *Id.* at *8. And Apria offers no new reason why that rejection was wrong. Apria is not a health care provider under § 29-26-101(a)(2)(B).

Neither is Apria a health care provider under § 29-26-101(a)(2)(E). Under subparagraph (E), a health care provider is a company that consists of at least one health care practitioner licensed or regulated under title 63 or 68. The Court ruled that Apria's respiratory therapists are not health care providers under the Act. *Id.* at *7. It interpreted *health care practitioner* to mean "someone who can provide medical services without oversight, or is being trained to do so." *Id.* at *6. Apria's respiratory therapists cannot provide their services without physician oversight, so they are not health care practitioners. Apria now contends that this definition goes against *Ellithorpe v. Weismark*, 479 S.W.3d 818 (Tenn. 2015).

In fact, the Tennessee Supreme Court's decision in *Ellithorpe* comfortably falls within the Court's definition of *health care practitioner*. In *Ellithorpe*, the court ruled that licensed clinical social workers are health care providers under § 29-26-101(a)(1). 479 S.W.3d at 827. Its reasoning was concise: Weismark was a licensed clinical social worker. Licensed clinical social workers "are

5

a group licensed and regulated under title 63 of the Tennessee Code." Thus, Weismark was a health care provider. *Id.* As Apria points out, the court simply looked at whether licensed clinical social workers are licensed under title 63 and stopped there. Thus, Apria asserts, all professions licensed and regulated under title 63 are health care practitioners, including respiratory therapists.

This argument is not persuasive. First, *Ellithorpe* was not about the definition of *health care practitioner* in § 29-26-101(a)(2)(E). Instead, it was about the definition of *health care provider* in § 29-26-101(a)(1). What's more, someone cannot be a health care practitioner simply because they work a job regulated by title 63 or 68. Title 63 includes veterinarians. TENN. CODE ANN. §§ 63-12-101 to -145. But actions under the Health Care Liability Act are limited to those involving medical care given "to a person." *Id.* § 29-26-101(a)(1). And title 68 includes bed-and-breakfast operators and innkeepers, who are a far cry from health care practitioners. *Id.* §§ 68-14-502, 68-14-601. Not every profession under titles 63 and 68 falls under § 29-26-101(a)(2)(E).

This argument also goes against the text of subparagraph (E). It defines *health care practitioner* as a company that consists of "health care practitioners licensed, authorized, certified, registered, or regulated under any chapter of title 63 or 68." Apria reads this to mean that all professions listed in title 63 and 68 are health care practitioners. But because titles 63 and 68 include veterinarians, B&B owners, and innkeepers, this reading cannot be correct. A better reading is that there are health care practitioners not regulated under title 63 or 68, and the Act applies only to those practitioners who must be licensed under either title.

And in fact, there are health care practitioners who do not have to be licensed under title 63 or 68. The Court defined *health care practitioner* as someone who can provide medical services without oversight, or is being trained to do so. Title 33 covers mental-health and drug-treatment workers. *Id.* §§ 33-2-421(a)(2), 33-2-402(12), (14). Among other things, these professionals "prevent, treat, or ameliorate mental illness, serious emotional disturbance, alcohol and drug use, [and] intellectual or developmental disabilities." *Id.* § 33-2-402(14). Treatment of drug use can fairly be called a medical service. So subparagraph (E)'s use of "any chapter of title 63 or 68" is a limiting clause, not a sufficient condition to being a health care practitioner.

6

Apria also maintains that licensed clinical social workers to do not "administer 'medical care.'" [D. 392 Ex. 1 at 4]. So if they are health care practitioners under *Ellithorpe*, then respiratory therapists are too. But there are two problems with this argument. First, the wording the Court used is whether a professional "can provide medical services without oversight," not whether they can administer medical care. Second, licensed clinical social workers meet this definition. Their work includes "diagnosis and treatment of mental, emotional and behavioral disorders, conditions and addictions, including severe mental illness in adults and serious emotional disturbances in children." TENN. CODE ANN. § 63-23-105(a). Treatment of the mind is as much medicine as treatment of the body. And licensed clinical social workers can practice without oversight (other than by a licensing body). *Id.* § 63-23-105(b)(5), (c). Respiratory therapists are not health care practitioners under the Health Care Liability Act. Apria is not a health care provider providing health care services, and Kenneth's suit does not fall under the Act.

### 2

Next, Apria contends that Kenneth's res ipsa loquitur claim should not have gone to the jury. To prove negligence through res ipsa loquitur, the plaintiff must show that the harmful event is "of a kind which does not ordinarily occur in the absence of negligence." *Burton v. Warren Farmers Coop.*, 129 S.W.3d 513, 525 (Tenn. Ct. App. 2002). The harmful event was the fire, caused by a spark meeting an oxygen-rich environment. The oxygen-rich environment, in turn, was caused by oxygen leaking from Jimmy's equipment. According to Apria, the evidence at trial showed that oxygen equipment leaks even when used perfectly. Thus, reasonable minds could only find that Jimmy did not prove negligence through res ipsa loquitur.

The Court disagrees. Apria relies on the testimony of Kenneth's expert, Michael Mariscalco. He testified,

> Q. The very fact that oxygen is being used . . . creates an oxygen-rich environment, even when it's being used completely appropriately?
> A. That's correct.
> Q. In a completely appropriate environment?

A. That's correct. Correct.

Q. That cannot be avoided when oxygen is being used, can it?

A. It can't be avoided. That's correct.

Tr. at 319:24–320:6. This testimony, however, concerns only the oxygen. It says nothing about the spark. And some of the owners' handbooks for Jimmy's equipment warned against leaving heat sources too close to the oxygen equipment. Pl.'s Ex. 6 at 3, Ex. 21 at 4. Oxygen leakage might happen without negligence. But the evidence, viewed in the light most favorable to Kenneth, reveals that oxygen *fires* don't happen without negligence. The Court cannot say that reasonable minds would find only for Apria on Kenneth's res ipsa loquitur claim.

### 3

Kenneth brought negligence claims against Apria for failing to teach Jimmy how to use his equipment, failing to check that the environment was suitable for his equipment, and failing to investigate and fix any oxygen leaks. Apria, focusing on the first two claims, contends that Kenneth failed to prove breach and causation. Alternatively, Apria argues that a new trial is warranted because the jury's verdict was against the clear weight of the evidence.

The Court sees no need to second guess the jury's verdict. On the failure-to-instruct claim, the evidence showed that the Apria delivery technician did not make sure that Kenneth was present while setting up Jimmy's equipment, despite instructions to do so. Apria asserts that no jury could look at this scant evidence and find that Apria breached a duty.

In fact, reasonable minds could differ. James Maupin, who set up Jimmy's equipment, testified that Jimmy seemed lucid during the setup. Tr. at 730:10–731:16. Yet the work order stated, "member requests that son Kenneth is called for delivery because member will not understand." Pl.'s Ex. 92. And Maupin testified that he had not even seen the work order until long after the setup. Tr. at 773:12–774:2. Apria's duty to instruct Jimmy included a duty to bring Kenneth into the process. But Apria never did so. *Id.* at 517:6–13.

There were also the equipment handbooks, which warned the user of fire risks. Apria maintains that these handbooks adequately instructed Jimmy on how to avoid fires. But at trial, there

8

was evidence to the contrary. The oxygen-concentrator handbook warned that materials that normally do not burn will easily burn if ignited in oxygen-rich air. Pl.'s Ex. 20 at 3. And the regulator handbook warned that oxygen can saturate fabric and cause it to burn if ignited. Pl.'s Ex. 21 at 10. Apria gave Jimmy neither of these manufacturer's handbooks, and the Apria handbook that it did give Jimmy contained neither warning.

The concentrator handbook also warned against having any matches, lit cigarettes, or other ignition sources in the same room as the equipment. Pl.'s Ex. 20 at 4. The Apria handbook, by contrast, warned against having heat sources less than five feet away. Pl.'s Ex. 6 at 3. Jimmy's camper, though, was one large room. Had he received the concentrator handbook, he would have learned that it was not safe to have his equipment inside. What's more, Apria's head of compliance testified that all customers should be given the manufacturers' handbooks, and she did not know why Jimmy had not received them. Pl.'s Ex. 22 at 9:30–9:33. Reasonable minds could find that Apria breached its duty to instruct Jimmy on the safe use of his equipment.

The same goes for Kenneth's claim that Apria failed to check the environment's suitability. This claim covers both the initial setup and the subsequent equipment replacements. Kenneth put on enough evidence that Apria failed to properly inspect Jimmy's camper during the initial setup. Mariscalco testified that, given the camper's small size, its lack of ventilation, the amount of medical oxygen, and the potential heat sources, the camper was "unusable." Tr. at 308:16–24. So while Apria's employee did testify that he checked inside the camper during the setup, reasonable minds could differ about whether the setup should have happened in the first place.

Kenneth also put on enough evidence about the subsequent equipment replacements. Apria's delivery technician handbook stated, "Ongoing assessment of the home environment should occur whenever a representative of Apria visits the patient's home as conditions are subject to change." Pl.'s Ex. 21 at 5. And the delivery paperwork included an Environment Suitable box for the delivery technician to check. Pl.'s Ex. 88. Yet Jimmy's camper was checked only once between the setup and his death. Nor did any other delivery technician actually make an effort to enter Jimmy's cabin, not even bothering to knock on the door. Tr. at 132:12–135:4. Reasonable minds could find

9

that Apria breached its duty to make sure that Jimmy's environment was suitable for his equipment.

Apria points out that it couldn't just refuse to deliver Jimmy's much-needed equipment. True. But Apria did have a duty to warn Jimmy about the dangers of using the equipment inside his camper. A jury could fairly find that Apria breached that duty.

Last, reasonable minds could differ on causation. Apria's breach must have been a but-for cause of Jimmy's death and a substantial factor in it. *See, e.g.*, *King. v. Anderson Cty.*, 419 S.W.3d 232, 246–47 (Tenn. 2013). As already explained, there was evidence that Apria failed to warn Jimmy that oxygen equipment can oxygenate the environment, creating a fire hazard. And by failing to give Jimmy the manufacturers' handbooks, he did not know that his camper was too small for his equipment. There was also evidence that Apria failed to advise Jimmy that he should move into Kenneth's house during the winter, rather than use heat sources in the camper. Jimmy might have told the setup delivery technician that he was not allowed to stay in the house. Tr. at 726:20–22. But Jimmy's granddaughter and Kenneth testified that he could stay there. *Id.* at 390:24–391:5, 474:2–6. Reasonable minds could differ on whether Apria's failures to instruct and to check the environment satisfied the causation element of Kenneth's negligence claims.

## 4

Fourth, Apria asserts that the jury went against the clear weight of the evidence by apportioning only 49% of the fault to Jimmy. Apria restates the arguments made with regard to breach and causation, but these arguments have been rejected.

Apria also contends that the 49% figure, combined with the question the jury asked the Court, reveals that the jury's apportionment was based on sympathy toward the Kelleys or prejudice against Apria. During deliberations the jury told the Court, "Would like more explanation on #3." [D. 374 at 5]. Question 3 on the verdict form instructed the jury to determine Kenneth's damages without reducing those damages by the fault it assigned to Jimmy. [D. 373 at 3]. The Court answered that the jury instructions provide the law and that it could not provide more instruction. Tr.

at 933:9–18. The jury returned a verdict of $2.5 million in damages with 49% of the fault apportioned to Jimmy. The Court cannot see how the jury's open-ended request about Question 3, the Court's nominal answer, and the 49% figure reveal a verdict based on sympathy or prejudice.

### 5

Apria's fifth charge is that the Court erred when it denied Apria's motion for a directed verdict on Jimmy's life expectancy. Kenneth's counsel read into the record that, according to the U.S. Life Tables, the life expectancy for a 72-year-old white male is 13.6 years. Tr. at 520:5–8. But two medical doctors testified that Jimmy had a much shorter life expectancy. One confirmed that Jimmy's illnesses would have shortened his life expectancy, and the other gave him a life expectancy of 2–16 months. *Id.* at 620:23–621:4; Pl.'s Ex. 37 at 45:11–51:10. Apria now claims that the evidence was so strong in its favor that it deserves a post-trial directed verdict, or at least a new trial.

This claim ignores the nature of post-trial motions for a directed verdict. In ruling on such a motion, the Court does "not weigh evidence or evaluate the credibility of witnesses." *Goree v. UPS, Inc.*, 490 S.W.3d 413, 429 (Tenn. 2015). And regardless, the U.S. Life Tables offer a valid way for juries to calculate wrongful death damages. *Hall v. Stewart*, No. W2005-2948-COA-R3-CV, 2007 WL 258406, at *6 (Tenn. Ct. App. Jan. 31, 2007). The life-expectancy evidence does not warrant a judgment for Apria or a new trial.

### 6

Next, Apria asserts that the jury's $1.5 million award for the value of Jimmy's life was against the clear weight of the evidence. The figure was based on Jimmy's age, his health, his life expectancy, and the reasonable value of Kenneth's loss of consortium. Apria levels two arguments against the jury award. First, Apria maintains that, based on the life-expectancy evidence, the figure was excessive. But the Court has already rejected this argument.

11

Second, Apria contends that there was "highly inconsistent evidence" regarding Kenneth's loss of consortium. [D. 392 Ex. 1 at 22]. But inconsistent evidence is not grounds for a directed verdict, a new trial, or a damages reduction. Instead, what matters is whether the evidence leans so hard in Apria's favor that the Court must correct the jury's mistake. And the evidence here did not lean so hard. According to Kenneth, Jimmy was his best friend, and they "stuck together all the time." Tr. at 466:16–17. When Kenneth was growing up, they worked on cars and went fishing together. *Id.* at 470:1–10, 472:1–8. Jimmy liked to joke with Kenneth and was physically affectionate. *Id.* at 470:20–471:16. When Kenneth messed up, Jimmy was forgiving. *Id.* at 469:15–21. Later, Kenneth joined Jimmy at work with Southern Cast Iron. *Id.* at 470:11–19. Together these East Tennessee natives made the seats for Neyland Stadium. *Id.* When Kenneth had kids of his own, Jimmy helped raise them and was involved in their lives. *Id.* at 467:25–468:7, 471:10–25. And when Kenneth's kids had kids, Jimmy did the same. *Id.* at 468:8–10. This is more than enough to support the jury's verdict.

**7**

Apria also takes issue with certain comments made during jury selection. During jury selection, Kenneth's counsel told the jurors that Apria's attorneys had twelve locations across the county. Apria says that this comment "was wholly inappropriate, and clearly intended to prejudice the jury towards Apria by implying that Apria had the financial means to employ a large law firm in its defense." [D. 392 Ex. 1 at 24]. "These comments," Apria continues, "were intentional, constituted bad-faith on the part of the Plaintiff's counsel, and 'irreparably prejudiced the jury's verdict.'" [*Id.*].

Apria, however, offers literally no case law or evidence in support of its position. It offers only one citation that simply discusses the standard for a new trial, *Francis v. Clark Equipment Co.*, 993 F.2d 545, 552 (6th Cir. 1993). And according to this standard, the moving party "must overcome the substantial deference owed a jury verdict." *Radvansky v. City of Olmstead Falls*, 496 F.3d 609, 614 (6th Cir. 2007). Apria has not met that burden here.

## 8

Apria raises an eighth and final argument against the jury verdict. Jimmy's granddaughter, Ashley, testified during trial. While she was on the stand, the following exchange occurred. Eric Foust was Kenneth's counsel performing direct examination, and James Looper was an attorney for Apria:

> Q. Does your grandfather ever talk about his oxygen equipment?
>
> A. Yeah, he did. He would tell me that he was worried about it. He told me, he said, "When I die, I want you to have somebody come out here and get this stuff, because it's dangerous, and I don't want it to be in here for too long."
>
> MR. LOOPER: Your Honor, objection. This is not appropriate.
>
> THE COURT: I'm going to sustain that objection.
>
> MR. LOOPER: Ask the jury to disregard this, please.
>
> THE COURT: You may disregard that last comment.
>
> MR. FOUST: Are you aware of any problems he had with his equipment?
>
> A. Yes.
>
> Q. Could you tell us what those problems were?
>
> MR. LOOPER: No foundation for her to give any testimony with problems with oxygen equipment, Your Honor.
>
> MR. FOUST: Ms. Kelley, how often were you around your grandfather?
>
> A. I was around him a lot when I was a kid. I was always around him growing up. And then after he—
>
> Q. When he was using his oxygen equipment, how often did you see him?
>
> A. I saw him with it all the time.
>
> Q. Okay. During this time, did he express to you that he had problems with his oxygen equipment?
>
> A. Yes.
>
> MR. LOOPER: Also—
>
> THE COURT: I'm going to sustain that objection.
>
> MR. LOOPER: Ask the jury to disregard that answer, please, Your Honor.
>
> THE COURT: You may disregard that answer.

Tr. at 383:24–385:5. At the end of trial, the Court gave the following instruction:

> In reaching your verdict you may consider only the evidence that was admitted. Remember that any questions, objections, statements, or arguments made by the attorneys during the trial are not evidence. If the attorneys have stipulated or agreed to any fact, however, you will regard that fact as having been proved.
>
> Testimony that you have been instructed to disregard is not evidence and must not be considered. If evidence has been received only for a limited purpose, you must follow the limiting instruction I have given you. You are to decide the case solely on the evidence received at trial.

Apria contends that the exchange with Ashley was so sympathy-grabbing and prejudicial that the Court's instruction did not cure it. Instead, Apria concludes, the only remedy is a new trial.

The Court disagrees. "Generally, a non-constitutional trial error is harmless unless it is more probable than not that the error materially affected the verdict." *Stockman v. Oakcrest Dental Ctr.*, 480 F.3d 791, 799 (6th Cir. 2007) (internal quotation marks omitted). To make that determination, the Court looks at the record to see if the flawed evidence tended to prejudice to other side. *Id.* "Prejudice" here means a "substantial risk" that the jury reached its verdict even though "the rest of the evidence did not clearly support a finding of liability." *Id.*

The record from the trial, especially the evidence cited throughout this Order, does not reveal a substantial risk that the jury reached its verdict despite the evidence. Indeed, the evidence supports a finding of liability. And this conclusion is bolstered by the Court's curing instruction. *See, e.g.*, *Holmes v. City of Massillon*, 78 F.3d 1041, 1047 (6th Cir. 1996) ("Although such prejudice that affects the fairness of a proceeding can certainly be grounds for a new trial, when 'such prejudice is cured by instructions of the court, the motion for a new trial should be denied.'"). The jury did not reach its verdict based on prejudice. It reached its verdict based on the evidence. Apria's motion for a post-trial directed verdict, a new trial, or a damages reduction must be denied.

## II

Apria also moves to reduce the jury award. The jury awarded Kenneth $2.5 million, all of it noneconomic damages. Apria asks that the Court reduce the award to $750,000 per a Tennessee statutory cap; set off that $750,000 by the amount Kenneth received from settling with other defendants; and then reduce that set-off amount by 49% to reflect Jimmy's comparative fault. Kenneth requests that the Court apply the 49% first, apply a statutory cap of $1 million, and disregard any settlement amounts.

The Court will take a middle path and reduce Kenneth's award to $750,000. The first issue is which reduction comes first: the 49% comparative-fault reduction, or the statutory cap. Tennessee law is clear that the reduction comes before the cap. In *Monypeny v. Khiev*, No. W2014-656-COA-R3-CV, 2015 WL 1541333 (Tenn. Ct. App. Apr. 1, 2015), the court held that, "in personal injury cases, the trial court should first reduce the jury's award of non-economic damages by the percentage of comparative fault, and then, if the adjusted award is still above the statutory cap, the court should reduce the award further to comport with the cap." *Id.* at *26.

Apria acknowledges *Monypeny* but insists that the Tennessee legislature intended the opposite. Specifically, Apria cites Tennessee Code § 29-39-102(b), which reads,

> If multiple defendants are found liable under the principle of comparative fault, the amount of all noneconomic damages, not to exceed seven hundred fifty thousand dollars ($750,000) for each injured plaintiff, shall be apportioned among the defendants based upon the percentage of fault for each defendant, so long as the plaintiff's comparative fault (or in a wrongful death action, the fault of the decedent) is not equal to or greater than fifty percent (50%), in which case recovery for any damages is barred.

Apria infers from this statute a legislative intent for the statutory cap to precede the plaintiff's comparative fault. It focuses on the first half of the text (before *so long as*), which directs courts to apply the cap, then apportion those capped damages among the defendants according to their fault relative to each other. But this half of the statute speaks only about multiple defendants, not

15

a plaintiff and a defendant. And the second half of the text (starting with *so long as*) reveals that, if the plaintiff is more than half at fault, then he gets nothing. If the plaintiff gets nothing, then there is no point in applying the cap at all. So when it comes to the plaintiff, the comparative-fault reduction comes first.

Indeed, the *Monypeny* court rejected this exact argument. 2015 WL 1541333, at *25. Kenneth's award of $2.5 million must be reduced by 49%, bringing the amount to $1,275,000.

The next issue is whether to reduce that amount to $1 million or $750,000. Tennessee Code § 29-39-102(a)(2) allows compensation "for any noneconomic damages suffered by each injured plaintiff not to exceed seven hundred fifty thousand dollars." But subsection (c) says that if an injury is "catastrophic in nature," the $750,000 cap is raised to $1 million. Apria contends that *catastrophic injury* does not include death. Apria also asserts that Kenneth did not properly plead catastrophic injury.

Under § 29-39-102(c), *catastrophic injury* does not include the death of someone without minor children. The statute lists four catastrophic injuries:

(1) Spinal cord injury resulting in paraplegia or quadriplegia;

(2) Amputation of two hands, two feet, or one of each;

(3) Third-degree burns over 40% or more of the body, or on 40% or more of the face; or

(4) Wrongful death of a parent leaving surviving minor children over whom the parent had custody or visitation rights.

TENN. CODE ANN. § 29-39-102(d). At trial, the evidence showed that Jimmy suffered third-degree burns over 90% of his body. But he also died from his injuries. He therefore did not suffer a catastrophic injury.

This can be gleaned from the listed injuries themselves. As Apria points out, they all have one thing in common: permanency. Someone who suffers paralysis, amputation, third-degree burns, or loss of a parent must live with that injury for the rest of his life. And because he must live with an unrecoverable injury, Tennessee allows him more compensation than it does for someone with a recoverable injury.

16

Section 29-39-102(a)(2) also supports this reading. It imposes the $750,000 cap for "each injured plaintiff," regardless of how many actions "allegedly caused the injuries or death." A line here is drawn between injury and death. And it shows that the $750,000 cap applies in wrongful-death suits (unless the plaintiff is a surviving minor child).

This conclusion also finds support in other statutes. Tennessee law defines *serious bodily injury* as involving

(A) A substantial risk of death;

(B) Protracted unconsciousness;

(C) Extreme physical pain;

(D) Protracted or obvious disfigurement;

(E) Protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty; or

(F) A broken bone of a child under twelve years old.

TENN. CODE ANN. § 39-11-106. Only the first member on the list involves death. And Tennessee courts have interpreted *substantial risk of death* to not include actual death. *See, e.g.*, *State v. Beaty*, No. M2014-130-CCA-R3-CD, 2016 WL 6600148, at *29 (Tenn. Crim. App. Nov. 8, 2016). So in defining *serious bodily injury*, this statute likewise draws a line between injury and death.

Finally, Tennessee decisions using *catastrophic injury* almost always refer to injury, not death. *See, e.g.*, *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 425 (Tenn. 2013); *Bomley v. Mid-America Corp.*, 970 S.W.2d 929, 937 (Tenn. 1998) (Holder, J., concurring and dissenting); *Miller v. Northland Ins. Co.*, No. M2013-572-COA-R3-CV, 2014 WL 1715076, at *1 (Tenn. Ct. App. Apr. 29, 2014); *Mullins v. Redmon*, No. W2007-616-COA-R3-CV, 2007 WL 4415266, at *1 (Tenn. Ct. App. Dec. 19, 2007); *Earls v. Earls*, 42 S.W.3d 877, 910 (Tenn. Ct. App. 2000); *Hartman v. Univ. of Tenn.*, No. 01A01-9804-BC-196, 1998 WL 639121, at *1 (Tenn. Ct. App. Sept. 14, 1998); *State v. Harris*, No. W2013-1028-CCA-R3-CD, 2014 WL 3954054, at *14 (Tenn. Crim. App. Aug. 13, 2014). The term as used in § 29-39-102 does not include death, even when someone

dies from a catastrophic injury. Jimmy, then, did not suffer a catastrophic injury. Kenneth's damages award must be reduced to $750,000.

The final issue is whether to set off this $750,000 by the settlement amounts Kenneth got from the codefendants. Under Tennessee law, a release signed between a plaintiff and codefendant "reduces the claim against the others to the extent of any amount stipulated by the release." TENN. CODE ANN. § 29-11-105(a)(1). And evidence of the release "may be introduced upon motion after judgment to reduce a judgment by the amount stipulated by the release." *Id.* § 29-11-105(b). Apria, citing this text, contends that the settlement amounts Kenneth received from the codefendants should be subtracted from the $750,000. Kenneth asserts that this statute has been made obsolete by Tennessee case law.

"This statute was rendered obsolete in 1992 by Tennessee's adoption of a system of comparative fault." *Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577, 591 (6th Cir. 2000) (discussing *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992)). This is because, when a jury apportions fault between the plaintiff and remaining defendant, it apportions 100% of the fault between them. There is no fault left to apportion to the defendants who settled. Yet a reduction in what the remaining defendant owes would amount to shifting fault to these settling defendants without a proper finding of fact on their fault. *See Varner v. Perryman*, 969 S.W.2d 410, 413 (Tenn. Ct. App. 1997). What Apria should have done was amend its answer to assert fault against the settling defendants and thus present an opportunity for the jury to apportion fault among them. *Sears v. Metro. Nashville Airport Auth.*, No. M2001-850-COA-R3-CV, 2002 WL 870542, at *3 (Tenn. Ct. App. May 7, 2003). But Apria did not, so § 29-11-105 does not apply to Kenneth's award.

Apria maintains that, even if the statute is obsolete, Kenneth's award should still be set off by the settlement amounts. Otherwise his total recovery will exceed the $750,000 cap. This argument, however, ignores the statute's text. It applies to how much "each injured plaintiff may be *awarded*." TENN. CODE ANN. § 29-39-102(a) (emphasis added). The use of *awarded* indicates that the statutory cap concerns only amounts determined by a finder of fact. For instance, a plaintiff may be awarded an extra $250,000 if he suffers a catastrophic injury. *Id.* § 29-39-102(c). But to

18

get that extra money, as Apria points out, "the trier of fact must make a specific finding of fact, by special verdict." *Id.* § 29-39-103(b).

Costs are not determined by a finder of fact. Instead, the prevailing party gets them simply by winning, after submitting a bill of costs to the Clerk of Court. FED. R. CIV. P. 54(d)(1); E.D. Tenn. L.R. 54.1. Tennessee law also makes this damages-costs distinction in other statutes. *Compare* TENN. CODE ANN. § 29-39-102 (cap on noneconomic damages), *with id.* § 20-12-101 (costs). Costs are not an award, and they are not factored into the statutory cap. Apria's motion for a damages reduction must be granted, and Kenneth's jury award must be reduced to $750,000.

### III

Last, Apria asks the Court to relieve it from the costs assessed by the Clerk. It contends that giving Kenneth costs would take him over the statutory damages cap. Apria also argues that costs should be denied because this case was close and difficult. Instead, it says that Kenneth should pay his own costs.

Apria will not be relieved of paying Kenneth's costs. The Court has already rejected the argument that costs are factored into the statutory damages cap. But here, Apria also cites cases that say otherwise. These cases, however, address not the cap on personal-injury damages but rather the cap on damages under the Governmental Tort Liability Act. The GTLA's cap applies to "any judgment." TENN. CODE ANN. § 29-20-404(a). And the cases Apria cites concern the interest rate on judgments. *See, e.g.*, *Erwin v. Rose*, 980 S.W.2d 203, 209–10 (Tenn. Ct. App. 1998) (discussing Tennessee Code § 47-14-121). Interest on a judgment is part of the judgment. Costs are not part of damages.

Nor was this case close and difficult, at least as far as costs are concerned. Apria bases its argument on (1) the directed verdict that Jimmy was contributorily negligent; and (2) the jury's apportionment of 49% of the fault to Jimmy. Yet this is not enough to deem a case close and difficult. Closeness is measured by "the refinement of perception required to recognize, sift through and organize relevant evidence, and by the difficulty of discerning the law of the case."

19

*White & White, Inc. v. Am. Hosp. Supply Corp.*, 786 F.2d 728, 732–33 (6th Cir. 1986). Under this measure, a case is not close and difficult just because a jury finds a plaintiff partially at fault. And even if this case were close and difficult, "a district court does not abuse its discretion merely because it awards costs in a 'close and difficult' case." *McDonald v. Petree*, 409 F.3d 724, 732 (6th Cir. 2005) (quoting *White & White*, 786 F.2d at 730). Kenneth is entitled to costs.

## IV

For these reasons, the Court orders as follows:

1. Apria's motion for a post-trial directed verdict, new trial, or reduction in damages [D. 392] is **DENIED**;

2. Apria's motion for a reduction in damages [D. 391] is **GRANTED**, and Kenneth's damages award is **reduced to $750,000**; and

3. Apria's motion for relief from costs [D. 403] is **DENIED**.

**IT IS SO ORDERED.**

*/s/ Pamela L. Reeves*
**UNITED STATES DISTRICT JUDGE**